**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON  DIVISION**

| | | |
|---|---|---|
| **ALLY JEAN-FRANCOIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | **5:07-CV-34 (CAR)** |
| **JOHN DAVID ANDERSON, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Currently before the Court is Defendants' Motion for Summary Judgment [Doc. 20]. This case arises from the termination of Plaintiff Ally Jean-Francois from his position of police officer with Defendant Fort Valley Police Department in Fort Valley, Georgia. Through the present motion, Defendants assert they are entitled to judgment as a matter of law on Plaintiff's claims of disparate treatment and hostile work environment brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, et. seq., because Plaintiff has not identified sufficient evidence of a prima facie case of either type of discrimination. Plaintiff filed a timely Response [Doc. 27] to Defendants' motion, and Defendants filed a timely Reply [Doc. 32] thereto. This Court granted Plaintiff's motion for leave to file a sur-reply brief, but no such brief was ever filed. Having considered all briefs and evidence submitted and for the reasons discussed below, Defendants' Motion for Summary Judgment is hereby **GRANTED**.

## I.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir.1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323.

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed.R.Civ.P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v.

Hull, 932 F.2d 1572, 1577 (11th Cir.1991).  Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

## I.  FINDINGS OF FACT

The facts, as viewed in the light most favorable to Plaintiff, are as follows:

In November of 2005, Plaintiff Ally Jean-Francois ("Plaintiff"), an African-American, United States citizen who immigrated from Haiti, responded to a internet job posting for a police officer position with the Fort Valley Police Department ("Department").  Plaintiff telephoned the Department and spoke to the then acting Chief of Police about the posted job.  Plaintiff subsequently submitted an application, interviewed, and was formally awarded the job on November 14, 2005.

Because Plaintiff had not previously undergone the training required by the state to be a police officer, he was supposed to begin training at the Middle Georgia Police Academy immediately after he was hired.  However, the acting Police Chief, Captain Yingling, and Sergeant Strickland (Plaintiff's immediate supervisor) lost his paper work, and he was not sent for training.  According to Plaintiff, he experienced no problem working in the Department during this time.

On January 1, 2006, Defendant John David Anderson, a white male, took over as Police Chief of the Fort Valley Police Department.  According to Plaintiff, Chief Anderson immediately made note of his national origin, asking Plaintiff where he was from.  Anderson then stated something to the effect that it was strange for someone from Haiti to be working as a police officer in Fort Valley, Georgia. Sometime later, Chief Anderson noticed that Plaintiff was not being trained and also made the comment that Plaintiff was "being paid to do nothing."  It is undisputed that the comment was not directed at Plaintiff, but rather to the personnel who had failed to provide Plaintiff with timely training.  In fact,

3

without the necessary training to perform the duties of a police officer, Plaintiff spent the large majority of his time reading policy and training manuals.  Chief Anderson also required that Plaintiff change the oil and tires on the Department's fleet of vehicles.  He was not issued a department uniform during this time, and no other police officers were asked to maintain the Department vehicles.

Despite lacking the proper training to act as a police officer, Plaintiff was nevertheless permitted to ride along with fellow officers.  During these ride-alongs, Plaintiff used the police radio to communicate with emergency dispatch personnel.  Later, dispatch personnel and other officers complained that they had trouble understanding Plaintiff when he was speaking.  It is undisputed that Chief Anderson had concerns about Plaintiff's communication skills and spoke with plaintiff about working on his accent.  According to Plaintiff, Chief Anderson said something to the effect of "hey buddy, I'm not going to fire you yet, but you need to change your English accent."  Chief Anderson was also alleged to have made comments to other people in the Department regarding Plaintiff's accent and the fact that he was from Haiti.  Plaintiff claims to have been told by one co-worker that Chief Anderson did not like him because of his accent and because he was from Haiti.  Plaintiff also alleges that Chief Anderson told a Department secretary that he wanted to fire Plaintiff  because of his accent and because he was from Haiti.  Plaintiff, however, made no formal complaint and filed no grievance about the comments made by Chief Anderson.

In April of 2006, Plaintiff finally began training at the Middle Georgia Police Academy. Plaintiff, however, was not issued the traditional cadet uniform shirts prior to beginning school.  He was the only student without a proper uniform shirt.  Plaintiff was instead allowed to wear a short-sleeved sport shirt during training.  It is undisputed that Plaintiff did not have the traditional cadet uniform because the Department had recently changed distributors and did not receive a shipment in time.  The shirts were ordered and paid for but did not arrive until after Plaintiff was terminated.  Plaintiff did not

file any complaint or grievance about not having a proper uniform shirt for training. Plaintiff does claim, however, that another, unidentified, Caucasian male was given a proper uniform prior to training, but there is no evidence when this other officer attended training or requested his uniform.

As part of the required training program, each cadet is required to take and pass a number of exams. Although a cadet can be certified after failing up to two of the required exams, the cadets must pass each exam when they re-take it. A cadet may not be certified if he fails three of the exams. While in training, Plaintiff failed two exams. He would not be permitted to graduate if he failed a third.

On May 17, 2006, Plaintiff was taking a written exam at the Academy and was accused, by two different instructors, of looking on another student's paper during the exam. He was subsequently dismissed from the Academy for cheating. John Taylor, the Director of the Academy, called Defendant Anderson to notify him of the circumstances surrounding Plaintiff's dismissal. There is no evidence in the record that Chief Anderson personally knew Mr. Taylor or otherwise spoke to him about Plaintiff's attendance at the Academy prior to this phone call. It is, in fact, undisputed that Chief Anderson did not know Taylor before this conversation and had never met him or spoken with him by telephone. Because Plaintiff had been dismissed from the Academy, he could not be certified and could not perform the duties of a police officer. Chief Anderson subsequently terminated Plaintiff, a probationary employee, from his position with the Fort Valley Police Department. Plaintiff was advised that he was terminated because he cheated on his exam at the Academy. Chief Anderson did not undertake any investigation of the cheating allegations prior to terminating Plaintiff's employment.

Plaintiff adamantly denies that he cheated on the exam and claims that his dismissal was a conspiracy among "everyone" involved, including Chief Anderson and his Academy instructors. Plaintiff had seventeen of his classmates sign a petition stating that they did not believe that he would cheat. Plaintiff admits, however, that he knows of no relationship between Chief Anderson and any

5

of the people involved prior to Plaintiff's dismissal from the Academy.

Plaintiff subsequently attempted to re-enroll in the Middle Georgia Police Academy, but he was denied admission.  There is no evidence that Chief Anderson ever spoke to anyone at the Academy about the decision to dismiss Plaintiff or his application for re-admission.

On September 13, 2006, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging Defendant Anderson discriminated against him because of his race and national origin when he was terminated on May 17, 2006.  Plaintiff received a right to sue letter from the EEOC on October 31, 2006, and filed the instant lawsuit on January 29, 2007.

## III.  DISCUSSION

Through this action, Plaintiff alleges that he was unlawfully subjected to disparate treatment and a hostile work environment because of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, et. seq.  His claims are stated against both Chief Anderson and the City of Fort Valley, Georgia.  Inasmuch, Plaintiff contends that Chief Anderson openly disliked him because of his race and national origin, treated him disparately and subjected him to a hostile working environment because of this animus, and ultimately terminated him solely because of his race and national origin.

As preliminary matter, the Court notes that Plaintiff's Title VII claims are improperly stated against Chief Anderson.  "Individual capacity suits under Title VII are . . . inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act." Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) (emphasis in original);[1] see also Yeldell v. Cooper Green Hospital, Inc., 956 F.2d 1056, 1060 (11th Cir.

---

[1]Although Busby was decided prior to the 1991 Amendment to the Civil Rights Act, the Eleventh Circuit later affirmed Busby after the amendment in Cross v. Alabama, 49 F.3d 1490 (11th Cir.1995).

1992) (holding Title VII actions are not appropriately brought against government officials in their personal capacities); Hinson v. Clinch County Board of Education, 231 F.3d 821, 826 n.6 (11th Cir. 2000) (holding Plaintiff was barred from bringing a Title VII action against individual defendants). Plaintiff concedes as much.  To that extent, Summary Judgment is hereby **GRANTED** as to all claims against Chief Anderson in his individual capacity.[2]

The claims against the City of Fort Valley, however, require a bit more discussion.  Plaintiff's disparate treatment and hostile work environment claims will be discussed in turn below.

A.  Disparate Treatment Claim

Disparate treatment discrimination claims brought under Title VII may be established by one of two ways, "through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination."  Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir. 1999); Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  To evaluate claims based upon circumstantial evidence, we use the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Id.  Where a plaintiff produces "direct evidence of discrimination," however, it is entirely unnecessary to rely on the McDonnell Douglas analysis.  Wright, 187 F.3d at 1293; see also Dybczak v. Tuskegee Inst., 737 F.2d 1524, 1528 (11th Cir. 1984).  "Once the plaintiff provides direct evidence of discriminatory motive, and the trier of fact

---

[2] In the event that Plaintiff also attempted to state a claim against Chief Anderson in his "official capacity," the Court notes that such claims are likewise inappropriate.  "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105 (1985) (quoting Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 2035 n.55 (1978)). Thus, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Id. at 166, 105 S. Ct. at 3105.  "[S]uits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly . . . ." Busby, 931 F.2d at 776 (citing Kentucky, 473 U.S. at 166). Therefore, to the extent such claims were made, the Court also grants summary judgment to Defendants with respect to any Title VII claims against Defendant Anderson in his official capacity.

accepts this testimony as true, the ultimate issue of discrimination is proved." Bass v. Board of County Comm'rs., 256 F.3d 1095, 1104 (11th Cir.2001).

In the case at bar, Plaintiff apparently attempts to prove his Title VII claim with both direct and circumstantial evidence.  The threshold question is thus "not whether plaintiff has made out a prima facie case of discrimination, but whether he even has to." Bernstein v. Sephora, 182 F. Supp. 2d 1214, 1217 (S.D. Fla. 2002).  If the plaintiff presents direct evidence of discrimination that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate, even where the employer presents conflicting evidence.  Id. (citing Taylor v. Runyon, 175 F.3d 861, 867 n. 2 (11th Cir. 1999)).

　　　　1.　　　Plaintiff has not identified direct evidence of discrimination

"Direct evidence of employment discrimination is evidence from which a trier of fact could conclude, based on a preponderance of the evidence, that an adverse employment action was taken against the plaintiff on the basis of a protected personal characteristic." Wright, 187 F.3d at 1288. "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997).  The evidence, if believed, must prove the existence of the fact in issue without inference or presumption. See Kilpatrick v. Tyson Foods, Inc., 268 Fed. Appx. 860, 862 (11th Cir. 2008).  Thus, "[o]nly the most blatant remarks whose intent could only be to discriminate . . . constitute direct evidence." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1226 (11th Cir. 1992); Bass, 256 F.3d at 1105.   The proffered statements must both "reflect a discriminatory attitude and tie the discriminatory attitude to the relevant employment decision." Bernstein, 182 F. Supp.2d at 1217 (citing Wright, 187 F.3d at 1294).

In this case, Plaintiff relies upon alleged remarks by Chief Anderson regarding Plaintiff's accent and nationality as direct evidence of discrimination.  It is undisputed that Chief Anderson had concerns about Plaintiff's communication skills.  According to Plaintiff, Chief Anderson actually said something

to the effect of "hey buddy, I'm not going to fire you yet, but you need to change your English accent." Plaintiff also testified that Chief Anderson made comments to other people in the Department regarding Plaintiff's accent and the fact that he was from Haiti. Plaintiff claims to have been told by one co-worker that Anderson did not like him because of his accent and because he was from Haiti. Plaintiff also alleges that Anderson told a secretary that he wanted to fire Plaintiff because of his accent.

As an initial matter, the Court notes that the last two of the alleged statements, those made to Plaintiff's co-workers, clearly involve multiple layers of hearsay. While hearsay may be admissible on summary judgment, it is admissible only where it may be reduced to an admissible form at trial. MacMillan v. Johnson, 88 F.3d 1573, 1585 (11th Cir. 1996). Plaintiff has cited no reason why the statements would be admissible at trial and has not offered the sworn testimony of the declarants on summary judgment. As such, this Court will not consider the comments for the purposes of determining whether they are direct evidence of discrimination.

However, even if these comments were considered on summary judgment, Plaintiff has failed to show that either these or the other alleged statements by Chief Anderson are direct evidence of discrimination. The Eleventh Circuit has made it clear that direct evidence is "evidence, which if believed, [proves] the existence of the fact in issue without inference or presumption." Kilpatrick, 268 Fed. Appx. at 862. The comments cited by Plaintiff still require the Court to infer that the decision to terminate Plaintiff was motivated by Plaintiff's race or national origin. At most, the statements cited establish the undisputed fact that Chief Anderson was concerned about Plaintiff's communication skills.

Moreover, as noted by Defendants, the Eleventh Circuit Court of Appeals affirmed, in a similar case, a finding that statements expressing concern over the communication abilities of a job applicant with a strong accent was not direct evidence of national origin discrimination. Hassan v. Auburn University, 833 F.Supp. 866, 871 (M.D.Ala.,1993), aff'd Hassan v. Auburn University, 15 F.3d 1097

(11th Cir. 1994).  In <u>Hassan</u>, the district court concluded that remarks concerning the plaintiff's accent were not direct evidence of discrimination because they were made in the context of his ability to communicate in a classroom, i.e, a skill materially related to his job performance.  <u>Id.</u>  In so doing, the court relied upon the Ninth Circuit Court of Appeals' holding that "[t]here is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." <u>Id.</u> (citing <u>Fragante v. City and County of Honolulu</u>, 888 F.2d 591, 595 (9th Cir.1989), cert. denied, 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990)).  The same rationale should apply in the present case.  Consideration and comment about a person's accent is not discriminatory when communication skills are material and reasonably related to job performance.  <u>See</u> <u>id.</u>

This Court, thus, agrees with Defendants that Chief Anderson could properly express concerns about Plaintiff's accent.  A police officer must obviously, as a matter of public safety, be able to communicate quickly and clearly with the public, over the police radio, and with other officers.  It is further undisputed that emergency dispatch personnel and other officers complained that they had difficulty understanding Plaintiff.  Therefore, because Plaintiff's communication skills were materially related to his job performance and Anderson was aware of possible communication problems caused by Plaintiff's accent, any comment about his accent would not necessarily be direct evidence of discrimination.  <u>See</u> <u>id.</u>

It should be noted that the present situation is distinguishable from <u>Akouri v. State of Florida Dept. of Transp.</u>, 408 F.3d 1338 (11th Cir. 2005), on which Plaintiff relies for the proposition that comments regarding an employee's accent are in fact direct evidence of discrimination.  In <u>Akouri</u>, the Court of Appeals held that an employer's statement explaining to a Lebanese-American employee that he was passed over for promotion because white employees were "not going to take orders from you,

especially if you have an accent," constituted direct evidence of discrimination.  Id. at 1347-48.  First, unlike in Akouri, Plaintiff was never directly told that he was terminated *because* of his accent.  Second, and more significantly, there was no argument in Akouri that co-workers had actual difficulty understanding the employee's accent or that the employee's communication skills were otherwise materially related to his job performance.  For these reasons, the Court finds Akouri to be inapposite to the present case.

To the extent that Plaintiff attempts to point to other "direct evidence" of discrimination, he has likewise failed.  Plaintiff complains that: (1) Chief Anderson commented that Plaintiff was being paid "to do nothing" when he learned that Plaintiff had not yet received the required training, (2) Chief Anderson required that Plaintiff change the oil and tires on Department Vehicles while he awaited training, and (3) Chief Anderson failed to provide him with an official uniform before he began training.  For the same reasons noted above, this evidence falls short of meeting the direct evidence standard.  The evidence requires the Court to infer that the Chief Anderson's decisions were motivated by Plaintiff's race or national origin.  This Court, therefore, finds that Plaintiff has failed to show that there exists any direct evidence of discrimination in this case.  That being decided, the next inquiry is whether Plaintiff has identified sufficient circumstantial evidence of discrimination.

2.     Plaintiff has not identified sufficient circumstantial evidence of discrimination

In the absence of direct evidence, a plaintiff must establish a prima facie case of discrimination through circumstantial evidence under the burden-shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under the McDonnell Douglas framework, the plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If plaintiff "fails

to satisfy any one of the elements of a prima facie case," summary judgment against the plaintiff is appropriate. Turlington v. Atlanta Gas Light Co., 135 F.3d. 1428, 1433 (11th Cir. 1998).

If, however, the plaintiff identifies sufficient evidence of a prima facie case, the defendant must then produce a legitimate, non-discriminatory reason to explain the challenged action. Burdine, 450 U.S. at 252-53. This burden is "exceedingly light;" the defendant must merely proffer a non-discriminatory reason, not prove it. Perryman v. Johnson Prods., Co., 698 F.2d 1138, 1142 (11th Cir. 1983). Furthermore, the "defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254-55.

Once a defendant proffers a non-discriminatory reason, the burden shifts back to the plaintiff to prove the proffered reason is mere pretext for the true discriminatory motive. To show that a defendant's stated reasons are pretext, the plaintiff must offer evidence "demonstrat[ing] that the proffered reason was not the true reason for the employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). The plaintiff may do this by showing "that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

Pursuant to this burden shifting analysis, the Court will first look to whether Plaintiff has identified sufficient evidence of a prima facie case of discrimination. To establish a prima facie case of disparate treatment in the workplace, a plaintiff must show that: (1) he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) similarly situated employees outside his classification were treated more favorably; and (4) he was qualified to do the job. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). Here, it is undisputed the Plaintiff belongs to a protected class. The remaining elements, however, are in dispute.

An adverse employment action for purposes of a prima facie case of discrimination in employment, must be a serious and material change in the terms, conditions, or privileges of employment in a "real and demonstrable way." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). Inasmuch, the Title VII plaintiff must either provide evidence of an "ultimate employment decision," (i.e. termination, failure to hire, or demotion), or, for conduct falling short of an ultimate employment decision, show that the employer's conduct, in some substantial way, altered his "compensation, terms, conditions, or privileges of employment," deprived him of employment opportunities, or adversely affected his status as an employee. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (quoting Gupta v. Florida Board of Regents, 212 F.3d 571, 587 (11th Cir.2000)). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis, 245 F.3d at 1239-40. Thus, not all conduct by an employer that negatively affects an employee constitutes an adverse employment action. See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998).

Here, Plaintiff identifies the following employment actions: (1) he was required to perform routine maintenance of Department vehicles; (2) he was not provided with a uniform for use during training, (3) he was told by Chief Anderson to change his accent, and (4) he was terminated. Obviously, being terminated from his position is an adverse employment action as the action represents a serious and material change in the terms of his employment. However, the other actions identified by Plaintiff fail to rise to this level.

Certainly, a change in work-related duties, such as Plaintiff's being made to perform vehicle maintenance, can constitute an adverse employment decision in some circumstances. However, "an employee alleging a loss of prestige on account of a change in work assignments, without any tangible

harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause-especially where . . . the work assignment at issue is only by definition temporary and does not affect the employee's permanent job title or classification." Davis, 245 F.3d at 1244.  Such is the case here.  The undisputed evidence shows that Plaintiff was asked to perform various other duties for the Department while he awaited mandatory training.  There is nothing in the record to suggest that this work assignment was anything other than temporary or that it in any way affected Plaintiff's permanent job title or classification.

The remaining employment actions – failing to provide Plaintiff with a uniform to use during training and counseling Plaintiff to work on his accent – likewise do not amount to the type of adverse employment actions that are actionable under Title VII.  The inability to wear a uniform does not change the terms or conditions of one's employment in any substantial way.  The same is true of Chief Anderson's conversation with Plaintiff about his accent.  Of course, in some situations, a reprimand may constitute an adverse employment action.  Chief Anderson's statements, however, fall far short of such a reprimand.  C.f., Wallace v. Georgia Dept. of Transp., 212 Fed. Appx. 799, 801 (11th Cir. 2006) (written letter of reprimand which did not lead to any tangible harm in the form of lost pay or benefits was not an adverse employment action).  There is no evidence that the conversation was actually a reprimand or that it otherwise lead to any tangible harm for Plaintiff.  Accordingly, the only event alleged by Plaintiff that amounted to the sort of adverse employment action recognized under Title VII is the termination of his employment.

Having established that Plaintiff suffered an adverse employment action, it must next be determined whether there is evidence that similarly situated employees outside Plaintiff's classification were treated more favorably or disciplined less harshly than Plaintiff or that Plaintiff was replaced by someone outside his protected class.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d

1181, 1185 (11th Cir. 1984); <u>Hall v. Alabama Ass'n of School Boards</u>, 326 F.3d 1157, 1166 (11th Cir. 2003); <u>Bolton v. Potter</u>, 2006 WL 2817528, at **1 (11th Cir. Oct. 3, 2006).  Here, Plaintiff fails to specifically identify any similarly situated employee outside of his classification that was treated differently.  More specifically, Plaintiff fails to identify any person that was also dismissed from the training academy for cheating and *not* terminated.  While Plaintiff does allege that an unknown, Caucasian officer who attended the Academy before him was provided with a uniform when he was not, the comparison is neither relevant nor persuasive.  Despite the obvious problem caused by Plaintiff's failure to actually identify the employee in question or secure evidence of his allegation, there is no indication that the unknown Caucasian officer is a proper comparator.  Furthermore, as the Court explained above, the inability to wear a specific uniform during training does not amount to the sort of adverse employment action recognized by Title VII.  Plaintiff has thus failed to establish the existence of a similarly situated employee that was treated more favorably.

In some discrimination cases, however, a failure to establish proper comparator evidence is not fatal.  Inasmuch, "the lack of a similarly situated comparator should not defeat [the plaintiff's] prima facie case when there is otherwise sufficient circumstantial evidence of discriminatory intent."  <u>Hunter v. Mobis Alabama, LLC</u>, 559 F.Supp.2d 1247, 1257 (M.D. Ala. 2008).  This is apparently the theory on which Plaintiff relies.

Here, Plaintiff cites to a number of comments made by Chief Anderson demonstrating discriminatory intent.  As discussed above, this Court has found that Anderson's various comments about Plaintiff's accent and national origin were not direct evidence of discrimination.  They may, however, serve as circumstantial evidence of discriminatory intent.  <u>Id.</u>  ("Although ambiguous comments merely suggesting discrimination do not furnish direct evidence, their ability to allow the

trier of fact to infer discrimination based on the evidence allows them to be considered as circumstantial evidence." ) (quoting Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1500-01 (11th Cir.1991)).

Even so, as also noted above, the most damaging of these statements are those self-serving, hearsay statements submitted by Plaintiff in which Chief Anderson allegedly told Plaintiff's co-workers that he disliked Plaintiff because of his accent and national origin and that he intended to fire Plaintiff on this basis. Again, while hearsay may be admissible on summary judgment, it is admissible only where it may be reduced to an admissible form at trial. MacMillan v. Johnson, 88 F.3d 1573, 1585 (11th Cir. 1996). Plaintiff has cited no reason why the subject statements would be admissible at trial and has not offered the sworn testimony of the declarants on summary judgment. As such, this Court will not consider those comments as evidence of discriminatory intent.

On the other hand, Plaintiff also relies on comments made *to him* by Chief Anderson regarding his accent. Such statements, although also hearsay, would assumably be admissible at trial. And while consideration and comment about a person's accent is not necessarily discriminatory when communication skills are material and reasonably related to job performance, such statements may support an inference of national origin discrimination and evidence a discriminatory intent. See Hassan, 833 F.Supp. at 871. Thus, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has identified minimally sufficient evidence of discriminatory intent.

The final element of a prima facie case of disparate treatment discrimination requires Plaintiff to prove that he was "qualified" for his position. Plaintiff has failed to identify such evidence. Actually, neither party directly addressed this element. Even so, it is undisputed that Plaintiff's position of police officer required that he attend mandatory training and receive state certification. It is further undisputed that Plaintiff was dismissed from the Middle Georgia Training Academy, an entity separate and apart from Defendants, for cheating and that he could, therefore, not receive the necessary

certification to become a police officer.  Without this certification, it appears to the Court that Plaintiff was, in fact, not qualified to continue in his position with the Fort Valley Police Department as a police officer at the time he was terminated.  C.f.,  Crapp v. City of Miami Beach, 242 F.3d 1017, 1020-1021 (11th Cir. 2001) (holding that post-termination decision to suspend officer's certification did not preclude officer from establishing his prima facie case under Title VII; at time of alleged discriminatory treatment, officer was certified and, therefore, qualified for his job).  To that end, Plaintiff has failed to identify sufficient evidence of a prima facie case of disparate treatment discrimination to survive summary judgment, and this Court need go no further.

However, even if Plaintiff *had* established sufficient circumstantial evidence of disparate treatment, Defendants successfully identified a legitimate non-discriminatory reason for the termination.  In short, Plaintiff, having been dismissed from the training academy, could not be certified as required to perform his job duties.  He was no longer qualified for his position.  It is undisputed that Plaintiff, a probationary employee, was advised that he was terminated from his position because he was dismissed from the training academy for cheating.  This evidence is sufficient to meet Defendants burden on summary judgement, as this burden is "exceedingly light."  See Perryman, 698 F.2d at 1142.

Once Defendants offer a non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to prove the proffered reason is mere pretext for the true discriminatory motive. To show that a defendant's stated reasons are pretext, the plaintiff must offer evidence "demonstrat[ing] that the proffered reason was not the true reason for the employment decision." Combs, 106 F.3d at 1528.  The plaintiff may do this "by showing both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr., 509 U.S. at 515.  Plaintiff has failed to meet this burden.  On summary judgment, Plaintiff merely suggests the existence of some type of conspiracy between Chief Anderson and those people involved with his discharge from the Middle Georgia Training Academy.

Plaintiff admits, however, that he knows of no relationship between Chief Anderson and any of the people involved prior to Plaintiff's dismissal from the Academy. There is likewise no evidence that Chief Anderson took any action to prevent Plaintiff from being allowed to re-enroll in that or any other police training academy. Any other possible, unsubstantiated links Anderson may have had with the Academy are just too attenuated to raise any genuine issues of fact.

Plaintiff also attempts to demonstrate pretext by showing that Chief Anderson failed to undertake any independent investigation of the cheating allegations prior to terminating Plaintiff's employment. This Court agrees with Defendants, however, that in the context of a claim based on discriminatory discharge, the issue is not whether Plaintiff actually cheated while at the Academy, but whether Chief Anderson believed he did. See Clark v. Ga. Dep't of Human Resources, 2006 U.S. Dist. LEXIS 56436, at *40 (N.D. Ga. July 11, 2006) (citing Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991); Hawkins v. Ceco Corp., 883 F.2d 977, 980 n. 2 (11th Cir. 1989)). It is undisputed that the Director of the Middle Georgia Training Academy advised Chief Anderson that Plaintiff was caught cheating and dismissed. The relevant inquiry ends with his actual dismissal from the Academy. Chief Anderson had no supervisory role at the Academy and no duty to investigate their decision to dismiss Plaintiff. If he subjectively believed that Plaintiff was dismissed from the Academy because he was caught cheating and if this belief was the reason behind his decision to terminate Plaintiff, the reason for Plaintiff's discharge was legitimate. See id. Thus, there is simply not enough evidence in the record to raise a material issue as to whether Chief Anderson was in any way involved with Plaintiff's dismissal from the Academy or that the proffered reason for his termination is otherwise pretextual.

For *all* of the above reasons, summary judgment is **GRANTED** with respect to Plaintiff's disparate treatment Title VII claim against Defendant City of Fort Valley.

B.  <u>Hostile Work Environment Claim</u>

Plaintiff also contends that he was subject to a hostile work environment while employed by Defendants.  As a preliminary matter, Defendants argue Plaintiff has not exhausted his administrative remedies with respect to this claim.  Specifically, Defendants assert Plaintiff's claim goes beyond the scope of his EEOC charge.  In response, Plaintiff argues that even though he did not specifically reference a hostile work environment claim in his charge, his claim can still go forward as it should have been discovered during the course of a reasonable investigation.

Before suing under Title VII, a plaintiff must first exhaust his or her administrative remedies. <u>Wilkerson v. Grinnell Corp.</u>, 270 F.3d 1314, 1317 (11th Cir. 2001) (citing <u>Crawford v. Babbitt</u>, 186 F.3d 1322, 1326 (11th Cir. 1999)).  Exhaustion first requires that a plaintiff file a charge of discrimination with the EEOC. <u>Id.</u> (citing 42 U.S.C. § 2000e-5(b) (1994); <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1332 (11th Cir. 2000)).  A plaintiff must do so within either 180 or 300[3] days "after the alleged unlawful employment practice occurred." 42 U.S.C.A. § 2000e-5(e)(1) (West 2000).  If a plaintiff fails to file before this time elapses, his claim is untimely and cannot form the basis of a Title VII claim. <u>Alexander</u>, 207 F.3d at 1332.  However, an alleged act of discrimination, not specifically included in the EEOC complaint, may form the basis of a Title VII claim if the alleged act of discrimination "was or should have been included in a reasonable investigation of the administrative complaint." <u>See</u> <u>Griffin v. Carlin</u>, 755 F.2d 1516, 1522 (11th Cir. 1985).

Here, Plaintiff completed and filed a Charge of Discrimination with the EEOC on September 5, 2006, alleging discrimination based on race and national origin.  As Defendants contend, Plaintiff

---

[3]The 300-day time period is utilized in those states that have entities with the authority to grant or seek relief with respect to unlawful employment practices and an employee files a grievance with that agency; in all other states, known as "non-deferral states," the charge must be filed within 180 days. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). Because Georgia is a non-deferral state, the 180-day time period applies. Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 (11th Cir. 2003).

only listed the single date of May 17, 2006, the date Plaintiff was discharged, as the relevant date of discrimination in his EEOC charge, and Plaintiff did not expressly state therein that this working conditions had been hostile, abusive, or even unpleasant.  Defendants further assert, therefore, that the Eleventh Circuit decision of Green v. Elixir, 152 Fed. Appx. 838 (11th Cir. 2005) mandates dismissal of this claim.  In Green, the Court held that the plaintiff's EEOC charge did not encompass a hostile work environment claim when plaintiff only stated one date of discrimination and alleged no facts that would lead to an investigation of harassment.  Id. at 840-41.  Green is distinguishable from the present case.  Unlike in Green, Plaintiff alleged facts in his EEOC complaint that could reasonably encompass a claim for hostile work environment.  The relevant portion of the charge is as follows:

> I was employed as a Police Officer with the above named employer from November 14, 2005 until May 17, 2006. I was undertaking training in the Police Academy. While I was employed by the Police Department, several people told me John Davis (White, non-Haitian), the Chief of Police, wanted to fire me. On one occasion, the Chief told me to work on my accent. He said people will not be able to understand me. He told another person that he thinks I am being paid for nothing. I had passed all my exams at the Academy and was due to become a Certified Police Officer in June 2006. On May 17, 2006, I took the EVOC exam along with 31 other candidates. I was discharged that same day.

> Captain Michael Yingling (White, non-Haitian) told me I was being discharged because I cheated on the EVOC exam.

> I believe I have been discriminated against because of my race (Black) and national origin (Haiti) in violation of Title VII of the Civil Rights Act of 1964, as amended.

Plaintiff Depo January 8, 2008 Ex. 12.

Certainly, Plaintiff was neither clear nor direct about his statement of a hostile work environment claim.  However, the Eleventh Circuit Court of Appeals requires that this Court liberally construe EEOC charges and that any claim which can reasonably be expected to grow out of the EEOC's investigation of the charge of discrimination should be allowed.  See Green, 152 Fed. Appx.

at 840.  For this reason, the Court finds that Plaintiff sufficiently exhausted his administrative remedies with respect to his hostile work environment claim.

Having so decided, the Court now turns to the merits of the claim.  In addition to prohibiting employment decisions based on race, color, religion, sex, or national origin, Title VII of the Civil Rights Act of 1964 also protects workers from having to work in a discriminatorily hostile or abusive environment.  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

To establish a hostile work environment claim, a plaintiff must show the following: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe and pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such an environment under a theory of vicarious or direct liability.  Id.  Here, there is no dispute as to whether Plaintiff has met the first three prongs of the prima face case.  Defendants only argue that Plaintiff cannot not meet the fourth prong, i.e., that the alleged harassment was "sufficiently severe and pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment."  The Court agrees.

Generally, "a plaintiff seeking to prove the existence of a hostile work environment must establish that the harassing conduct created both an objectively hostile or abusive environment-one that

a reasonable person would find hostile or abusive-and a subjectively hostile or abusive environment-one that the victim subjectively perceives to be abusive. Brantley v. City of Macon, 390 F.Supp.2d 1314, 1324 (M.D.Ga. 2005) (internal quotes omitted); see also Miller, 277 F.3d at1276. There are four general factors which may be considered when determining whether a work environment was sufficiently hostile in this respect: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 584 (11th Cir.2000) (citing Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir.1999) (en banc)). When making this determination, however, the district court is not to examine each of the employee's complaints in isolation; the court must "examine and consider all of the behavior and [racially motivated] conduct ... collectively in determining whether it meets the sufficiently severe or pervasive requirement." Id. at 586. In other words, "whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotes omitted). "Therefore, not all hostile remarks and conduct of which the plaintiff complains need be directed at the plaintiff in order to establish a viable hostile-environment claim." Brantley, 390 F.Supp.2d at1324-25; Hudson v. Norfolk S. Rwy. Co., 209 F.Supp.2d 1301, 1326 (N.D. Ga.2001) (citing Edwards v. Wallace Comm. Col., 49 F.3d 1517, 1522 (11th Cir.1995)). Remarks and conduct targeted at others "may contribute to the overall hostility of the working environment." Id. A plaintiff "may also support a claim of hostile work environment by the use of harassing conduct she learned of through hearsay, so long as she was aware of the harassing incidents at the relevant time at which she alleges she experienced the hostile environment." Id. (citing Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir.1999); Schwapp v. Town of Avon, 118 F.3d 106, 111 (2nd Cir.1997)).

Here, in support of his hostile work environment claim, Plaintiff relies upon evidence of: (1) Chief Anderson's multiple comments regarding Plaintiff's accent and Haitian decent, (2) Chief Anderson's statements to other employees about his dislike for Plaintiff and desire to fire Plaintiff because of his accent and because he was from Haiti, (3) Chief Anderson's comment that Plaintiff was being paid to "do nothing" while he awaited training, (4) Chief Anderson's decision to make Plaintiff perform routine maintenance on Department vehicles, and (5) Chief Anderson's failure to provide Plaintiff with a proper uniform before he began training at the Academy.

Even when considered in its totality, the conduct by Chief Anderson does not rise to the level of creating a hostile work environment. Plaintiff has simply failed to identify any evidence to suggest that the conduct was either objectively or subjectively "severe and pervasive." Although Plaintiff contends that Chief Anderson made multiple comments about his accent and nationality, to Plaintiff and to others, over the six month period he was employed at the Department, there is no evidence suggesting that the comments were made with any particular frequency. C.f., Miller, 277 F.3d at1276 (finding that there was sufficient evidence that conduct was frequent where plaintiff and others testified that the ethnic slurs were made three to four times a day). Certainly, there is no "magic number" of racial or ethnic insults necessary to maintain a hostile work environment claim; rather, it is only those "repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." Id. Even so, Plaintiff has failed to establish that there were such "repeated incidents" in this case, and it is undisputed that Plaintiff never made any formal complaint about Chief Anderson's comments.

There is also no evidence establishing the frequency with which Plaintiff was made to perform routine maintenance on the Department vehicles. Even if the Court was to assume that he performed these duties on a regular basis, there is insufficient evidence linking this job assignment to a

discriminatory animus.  In fact, there is evidence that Plaintiff was required to perform vehicle maintenance duties even before Chief Anderson's arrival, a time at which  Plaintiff admits that he had no problem working in the Department.   Moreover, the mere fact that Plaintiff's job duties were temporarily altered, even when considered in light of Anderson's comments, would not necessarily constitute evidence of a severe and pervasive hostile work environment.  See Smith v.Beverly Health and Rehabilitation Services, Inc., 978 F. Supp. 1116, 1121-22 (N.D. Ga. 1997) (granting summary judgment despite plaintiff's claim that his supervisor temporarily altered his work duties).

There is also nothing in the record to suggest that Chief Anderson's other conduct was "severe." The words and phrases used by Chief Anderson fall short on the spectrum of language that is particularly offensive.  At worst, Anderson stated that he did not like Plaintiff because of his national origin and told him to "change his English accent."  As noted by Defendants, cases involving comments and conduct far more offensive than those suffered by Plaintiff have failed to meet the severity requirement.  See, e.g., Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1146 (11th Cir. 2008) (conduct was not necessarily severe where the sole woman in a workplace was exposed to the words "cunt" and "whore,"  vulgar references to sexual acts , and conversations concerning ejaculation, men's erotic dreams, female sexual anatomy, sources and indications of female sexual arousal, and female pornography); Mitchell v. Carrier Corp., 954 F. Supp. 1568, 1577-78 (M.D. Ga.1995) (finding allegations that "Nigger Ape" and "Nigger" were written on bathroom walls, "KKK" initials were written on travel packets, and racist statements were made by a co-worker to be insufficiently severe for hostile environment claim).

There is likewise no evidence that Chief Anderson's conduct was "physically threatening or humiliating" or that it ever interfered, in any way, with Plaintiff's job performance.  Clearly, "Title VII is only implicated in the case of a workplace that is 'permeated with discriminatory intimidation,

ridicule and insult,' not where there is the 'mere utterance of an ... epithet.'" Miller, 277 F.3d at 1276-77 (citation omitted).  Here, Chief Anderson's comments may be more properly considered  mere "offensive utterances."  Plaintiff has not cited to any evidence that he was berated or taunted or even that he was in any way humiliated, embarrassed, or degraded by the comments, either objectively or subjectively.  There is likewise no evidence that Chief Anderson's alleged conduct made it difficult to for Plaintiff to concentrate on his work or ever caused him to change his behavior in the work place.  C.f., Reeves, 525 F.3d at 1147 (finding unreasonable interference with job performance when the conduct in question made it difficult for the plaintiff to concentrate on work and caused her to leave the pod and stand in the hallway).  Plaintiff apparently continued in his normal course of work, without formal complaint, despite the occasional reference to his accent and nationality, the requirement that he work on Department vehicles, and the absence of an official uniform for training.  There seems to have been no effect on Plaintiff's esteem or job performance.

Accordingly, because Plaintiff has failed to point to sufficient evidence establishing that Chief Anderson's comments and conduct occurred with any frequency or severity, that the conduct was physically threatening or humiliating, or that the conduct interfered, in any way, with Plaintiff's job performance, he has failed to raise a material question of fact regarding his hostile work environment claim.  See Gupta, 212 F.3d at 584; Mitchell v. Pope, 189 Fed. Appx. 911 (11th Cir. 2006); Jones v. United Space Alliance, L.L.C., 170 Fed. Appx. 52 (11th Cir. 2006) (holding that there was no genuine issue of material fact  where none of the alleged incidents occurred on a repeated basis, none of the incidents were physically threatening or humiliating, and none interfered with the employee's job performance).  Summary judgment is, thus, also **GRANTED** in favor of Defendants with respect to this claim .

**IV. CONCLUSION**

For the reasons stated above, the Defendants' Motion for Summary Judgment is hereby

**GRANTED**.

SO ORDERED this 17th day of December, 2008.


S/  C. Ashley Royal
C. ASHLEY ROYAL
United States District Judge


JLR/chw

26